## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES TSOU, derivatively on behalf of BLOCK, INC. f/k/a SQUARE, INC., | |
| Plaintiff, | Case No.: _____ |
| vs. | |
| JACK DORSEY, AMRITA AHUJA, ROELOF BOTHA, AMY BROOKS, PAUL DEIGHTON, RANDY GARUTTI, JAMES MCKELVEY, MARY MEEKER, ANNA PATTERSON, LAWRENCE SUMMERS, DAVID VINIAR, and DARREN WALKER, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| BLOCK, INC. f/k/a SQUARE, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff James Tsou ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Block, Inc. f/k/a Square, Inc. ("Block" or the "Company"), files this Verified Shareholder Derivative Complaint against Jack Dorsey ("Dorsey"), Amrita Ahuja ("Ahuja"), Roelof Botha ("Botha"), Amy Brooks ("Brooks"), Paul Deighton ("Deighton"), Randy Garutti ("Garutti"), James McKelvey ("McKelvey"), Mary Meeker ("Meeker"), Anna Patterson ("Patterson"), Lawrence Summers ("Summers"), David Viniar ("Viniar"), and Darren Walker ("Walker") (collectively, the "Individual Defendants," and together with Block, the "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors and/or officers of Block,

unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Block, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Block's directors and officers from November 4, 2021 through April 4, 2022 (the "Relevant Period") in connection with a data breach suffered by Block and one of its subsidiaries in December 2021. The breach resulted in a former Company employee obtaining access to highly sensitive personal information belonging to the Company's customers without the Company's permission.

2.      Block, formerly known as Square, Inc., is a Delaware corporation specializing in technology that creates tools for financial services. These financial service tools include Square, which provides commerce solutions and banking services to businesses, and Cash App, which offers mobile payment services to individuals.

3.      Cash App Investing is a subsidiary of Block and operates as the Company's stock trading platform. Cash App Investing maintains a highly valuable list of its customers, which includes full customer names and brokerage account numbers, brokerage portfolio values, broker portfolio holdings, and stock trading activity. The security of this sensitive information is critical to the Company's business, as unauthorized access to it would leave customers extremely vulnerable to scams and other fraudulent activity, like identity theft.

4.      Throughout the Relevant Period, Defendants failed to implement adequate security measures that would prevent sensitive customer information from being accessed by unauthorized individuals. In particular, Defendants failed to follow industry-wide cybersecurity standards despite knowing the value of customers' private information and the risks associated with unauthorized individuals obtaining access to it. These inadequate security measures resulted in the Company's failure to comply with Federal Trade Commission ("FTC") guidelines which prohibit "unfair or deceptive acts or practices in or affecting commerce."

5.      Because of the Company's inadequate security measures, it could not protect customers against potential data breaches. This resulted in a major data breach at Cash App Investing on December 10, 2021. That day, a former Company employee downloaded certain Cash App Investing reports containing personal information from its customer list without the Company's permission (the "Data Breach"). As a result of the Data Breach, the former employee obtained access to the full names and brokerage account numbers, brokerage portfolio values, brokerage portfolio holdings, and stock trading activities (the "Personal Information") of *more than 8.2 million* Cash App Investing customers.

6.      Despite becoming aware of the Data Breach soon after its occurrence, Defendants concealed it from affected customers and the overall public for months, instead making a series of

false and misleading statements touting the security measures the Company was taking to protect customers' Personal Information. Defendants did not disclose the Data Breach to affected customers or to the public until April 4, 2022, when the Company revealed the breach in a Form 8-K filed with the SEC. The Form 8-K further revealed that the Company was launching its own investigation into the Data Breach.

7.     On this news, the price per share of the Company's common stock fell $9.27, or 6.4%, from a closing price of $145.19 per share on April 4, 2022, to a closing price of $135.92 per share on April 5, 2022.

8.     A week later, on April 11, 2022, Defendants Viniar and Patterson informed the Company that they would not stand for re-election as members of the Company's Board of Directors (the "Board") at the Company's annual meeting of stockholders on June 14, 2022 (the "Annual Meeting"). The Company revealed this information to the public by filing a Form 8-K with the SEC on April 15, 2022. Although the Company stated that Defendants Viniar's and Patterson's decisions to step down from the Board were "a result of wanting to devote more time to other professional and personal activities," these departures occurred only one week after the public disclosure of the Data Breach and the Company's resulting stock drop. As a result of Defendants Viniar's and Patterson's resignations, the Board decreased its size from thirteen to eleven directors, which became effective at the Annual Meeting.

9.     On August 23, 2022, a class of consumers impacted by the Data Breach initiated an action in the United States District Court for the Northern District of California against Block and Cash App Investing for "their failure to exercise reasonable care in securing and safeguarding consumer information" in connection with the Data Breach.

10.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by allowing the Company to operate with deficient cybersecurity, which resulted in the Company failing to adequately protect customers' Personal Information from unauthorized access by Company outsiders. Specifically, the Company: (1) failed to follow industry-wide cybersecurity standards; (2) ignored both the value of customers' Personal Information and the risks associated with its unauthorized access; and (3) failed to comply with FTC guidelines by engaging in "unfair or deceptive acts or practices in or affecting commerce" (the "Cybersecurity Misconduct").

11.     The Individual Defendants also breached their fiduciary duties throughout the Relevant Period by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the security measures the Company was taking to protect its customers' Personal Information. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was engaged in the Cybersecurity Misconduct; (2) because of this, a former employee was able to download various Cash App Investing reports, giving this employee access to the Personal Information of more than 8.2 million Cash App Investing customers; (3) due to the foregoing, the Company was reasonably likely to suffer significant damage, including reputational harm; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

12.     The Individual Defendants further breached their fiduciary duties by failing to have Block timely notify impacted customers of the Data Breach.

13.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions

of material fact, while, during the Relevant Period, Defendant Ahuja sold Company shares at inflated prices for combined total proceeds of over $1,152,949.

14.     In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Approximately 1,207,221 shares of the Company's common stock were repurchased between November 1, 2021 and March 31, 2022 for over $196.3 million. As the Company's stock was actually only worth $135.92 per share, the price at which it was trading when markets closed on April 5, 2022, the Company overpaid for repurchases of its own stock by over $32.3 million in total.

15.     Additionally, in breach of their fiduciary duties, the Individual Defendants, during the Relevant Period, caused the Company to fail to maintain adequate internal controls.

16.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO"), to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and which has subjected the Company to a consumer class action pending in the United States District Court for the Northern District of California (the "Consumer Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

17.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the CEO's and CFO's liability in the Securities Class Action, and of the Company's liability in the Consumer Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

23.    Plaintiff is a current shareholder of Block. Plaintiff has continuously held Block common stock at all relevant times.

### Nominal Defendant Block

24.    Block is a Delaware corporation that "do[es] not designate a headquarters location as [it has] adopted a distributed work model." Block's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "SQ."

### Defendant Dorsey

25.    Defendant Dorsey co-founded the Company and is Chairperson of its Board. He has served as the Company's principal executive officer and as a member of its Board since July 2009, having previously served as its CEO and President since July 2009 until his title changed to Block Head as of April 2022.[1] Prior to this, he served as President and CEO of Twitter, Inc. ("Twitter"), an American social media company, from May 2007 to October 2008 and again as CEO from July 2015 until November 2021. According to the proxy statement that the Company filed with the SEC on April 28, 2022 (the "2022 Proxy Statement"), as of March 31, 2022, Defendant Dorsey beneficially owned 48,844,566 shares of the Company's common stock, representing 43.04% of the Company's outstanding shares, thus making Defendant Dorsey a controlling shareholder of the Company. Given that the price per share of the Company's common stock at the close of trading on March 31, 2022 was $135.60, Defendant Dorsey owned approximately $6.6 billion worth of Block stock.

---

[1] Throughout this complaint, Defendant Dorsey's principal executive position will be referenced as CEO.

26.     For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Dorsey received $2.75 in total compensation from the Company, made up entirely of his salary. For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Dorsey received $2.75 in total compensation from the Company, made up entirely of his salary. For the fiscal year ended December 31, 2019 (the "2019 Fiscal Year"), Defendant Dorsey received $2.75 in total compensation from the Company, made up entirely of his salary.

27.     The 2022 Proxy Statement stated the following about Defendant Dorsey:

*Jack Dorsey* is our co-founder and has served as our principal executive officer and as a member of our board of directors since July 2009, having previously served as our Chief Executive Officer and President since July 2009 until his title changed to Block Head as of April 2022. From May 2007 to October 2008, Mr. Dorsey served as President and Chief Executive Officer of Twitter, Inc. ("Twitter"). Mr. Dorsey returned to serve as Chief Executive Officer of Twitter from July 2015 until November 2021. He has served as a director of Twitter since May 2007 and will not stand for re-election at Twitter's 2022 annual stockholders' meeting. From December 2013 to March 2018, Mr. Dorsey served as a member of the board of directors of The Walt Disney Company.

Mr. Dorsey was selected to serve on our board of directors because of the perspective and experience he provides as one of our founders and our Block Head, as well as his extensive experience with technology companies and innovation.

**Defendant Ahuja**

28.     Defendant Ahuja has served as the Company's CFO since January 2019. According to the 2022 Proxy Statement, as of March 31, 2022, Defendant Ahuja beneficially owned 122,752 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2022 was $135.60, Defendant Ahuja owned approximately $16.6 million worth of Block stock.

29.     For the 2021 Fiscal Year, Defendant Ahuja received $10,235,667 in total compensation from the Company. This included $493,750 in salary, $4,931,901 in stock awards, $4,805,016 in option awards, and $5,000 in all other compensation. For the 2020 Fiscal Year,

Defendant Ahuja received $8,820,346 in total compensation from the Company. This included $468,750 in salary, $3,783,406 in stock awards, $4,385,035 in option awards, and $183,155 in all other compensation. For the 2019 Fiscal Year, Defendant Ahuja received $13,081,526 in total compensation from the Company. This included $425,000 in salary, $315,000 in bonus, $9,000,051 in stock awards, $3,000,026 in option awards, and $341,449 in all other compensation.

30.    During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Ahuja made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| January 3, 2022 | 1,925 | $162.29 | $312,408 |
| February 2, 2022 | 3,609 | $127.61 | $460,544 |
| April 4, 2022 | 2,680 | $141.79 | $379,997 |

Thus, in total, before the fraud was exposed, she sold 8,214 shares of Company stock on inside information, for which she received approximately $1,152,949 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the schemes.

31.    The 2022 Proxy Statement stated the following about Defendant Ahuja:

*Amrita Ahuja* has served as our Chief Financial Officer since January 2019. From March 2018 to January 2019, Ms. Ahuja served as the Chief Financial Officer of Blizzard Entertainment, Inc., a division of Activision Blizzard, Inc. Beginning in June 2010, she served in various positions at Activision Blizzard, Inc., including as Senior Vice President of Investor Relations from January 2015 to May 2018, Vice President, Finance and Operations from August 2012 to January 2015 and Vice President, Strategy and Business Development from June 2010 to August 2012. Prior to that, she was a Director of Business Development at Fox Networks Group, served in strategic planning at The Walt Disney Company from 2003 to 2005 and worked in investment banking at Morgan Stanley from 2001 to 2003. Ms. Ahuja currently serves on the boards of directors of Airbnb, Inc. and a privately-held company. She holds a B.A. in economics from Duke University and an M.B.A. from Harvard Business School.

**Defendant Botha**

10

32.    Defendant Botha has served as a Company director since January 2011 and has been the Company's Lead Independent Director since June 14, 2022. He also serves as a member of the Audit and Risk Committee and the Compensation Committee. According to the 2022 Proxy Statement, as of March 31, 2022, Defendant Botha beneficially owned 711,719 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2022 was $135.60, Defendant Botha owned approximately $96.5 million worth of Block stock.

33.    For the 2021 Fiscal Year, Defendant Botha received $304,729 in total compensation from the Company made up entirely of stock awards. For the 2020 Fiscal Year, Defendant Botha received $305,100 in total compensation from the Company. This included $13,750 in fees earned or paid in cash and $291,350 in stock awards. For the 2019 Fiscal Year, Defendant Botha received $305,369 in total compensation from the Company made up entirely of stock awards.

34.    The 2022 Proxy Statement stated the following about Defendant Botha:

*Roelof Botha* has served as a member of our board of directors since January 2011 and has been appointed as our Lead Independent Director, effective at the Annual Meeting. Since January 2003, Mr. Botha has served in various positions at Sequoia Capital, a venture capital firm, including as a Managing Member of Sequoia Capital Operations, LLC. From 2000 to 2003, Mr. Botha served in various positions at PayPal, including as Chief Financial Officer. Mr. Botha currently serves on the boards of directors of 23andMe Holding Co., Bird Global, Inc., Eventbrite, Inc. ("Eventbrite"), Natera, Inc., MongoDB, Inc. and Unity Software Inc. and a number of privately-held companies. Mr. Botha has notified Eventbrite that he does not plan to stand for re-election when his current term expires at the company's 2022 annual meeting of stockholders, expected to be held in June 2022. Mr. Botha holds a B.S. in Actuarial Science, Economics and Statistics from the University of Cape Town and an M.B.A. from the Stanford Graduate School of Business.

Mr. Botha was selected to serve on our board of directors because of his financial and managerial experience.

**Defendant Brooks**

35.    Defendant Brooks has served as a Company director since October 2019. She also serves as a member of the Nominating and Corporate Governance Committee. According to the 2022 Proxy Statement, as of March 31, 2022, Defendant Brooks beneficially owned 6,236 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2022 was $135.60, Defendant Brooks owned approximately $846,000 worth of Block stock.

36.    For the 2021 Fiscal Year, Defendant Brooks received $291,943 in total compensation from the Company made up entirely of stock awards. For the 2020 Fiscal Year, Defendant Brooks received $290,272 in total compensation from the Company made up entirely of stock awards. For the 2019 Fiscal Year, Defendant Brooks received $166,618 in total compensation from the Company made up entirely of stock awards.

37.    The 2022 Proxy Statement stated the following about Defendant Brooks:

*Amy Brooks* has served as a member of our board of directors since October 2019. Since November 2017, Ms. Brooks has served as President, Team Marketing & Business Operations and Chief Innovation Officer at the National Basketball Association ("NBA"), after serving as Executive Vice President from May 2014 to November 2017 and Senior Vice President from January 2010 to May 2014. Ms. Brooks also currently serves on the board of the Positive Coaching Alliance and on the board of directors of a privately-held company. Ms. Brooks holds a B.A. in Political Science and Communication from Stanford University and an M.B.A. from the Stanford Graduate School of Business.

Ms. Brooks was selected to serve on our board of directors because of her sales and marketing experience, as well as her expertise in growing a global brand.

**<u>Defendant Deighton</u>**

38.    Defendant Deighton has served as a Company director since May 2016. Defendant Deighton also serves as Chair of the Audit and Risk Committee and as a member of the Compensation Committee. According to the 2022 Proxy Statement, as of March 31, 2022,

Defendant Deighton beneficially owned 30,185 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2022 was $135.60, Defendant Deighton owned approximately $4.1 million worth of Block stock.

39.     For the 2021 Fiscal Year, Defendant Deighton received $303,009 in total compensation from the Company. This included $49,904 in fees earned or paid in cash, $249,842 in stock awards, and $3,263 in other compensation. For the 2020 Fiscal Year, Defendant Deighton received $314,480 in total compensation from the Company. This included $60,000 in fees earned or paid in cash, $249,924 in stock awards, and $4,556 in other compensation. For the 2019 Fiscal Year, Defendant Deighton received $309,934 in total compensation from the Company. This included $60,000 in fees earned or paid in cash and $249,934 in stock awards.

40.     The 2022 Proxy Statement stated the following about Defendant Deighton:

*Paul Deighton* has served as a member of our board of directors since May 2016. Mr. Deighton has served as the non-executive Chairperson of The Economist Group since July 2018 and of Heathrow Airport Holdings Limited, the owner of Heathrow Airport in the United Kingdom, since June 2016. From December 2012 to May 2015, Mr. Deighton served as Commercial Secretary to the Treasury and as a member of the House of Lords in the United Kingdom. Mr. Deighton previously served as the Chief Executive Officer of the London Organising Committee of the Olympic and Paralympic Games and held various roles at Goldman. Mr. Deighton currently serves as the non-executive Chairperson of Hakluyt Company Limited, an advisory firm, and as a member of the Restoration and Renewal Programme Sponsor Body of the Houses of Parliament. Mr. Deighton holds a B.A. in Economics from Trinity College, Cambridge University.

Mr. Deighton was selected to serve on our board of directors because of his financial and business expertise, as well as his international perspective and his government and regulatory experience.

**Defendant Garutti**

41.     Defendant Garutti has served as a Company director since July 2017. Defendant Garutti also serves as Chair of the Nominating and Corporate Governance Committee. According to the 2022 Proxy Statement, as of March 31, 2022, Defendant Garutti beneficially owned 18,601

shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2022 was $135.60, Defendant Garutti owned approximately $4.3 million worth of Block stock.

42.    For the 2021 Fiscal Year, Defendant Garutti received $299,842 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $249,842 in stock awards. For the 2020 Fiscal Year, Defendant Garutti received $297,163 in total compensation from the Company. This included $47,239 in fees earned or paid in cash and $249,924 in stock awards. For the 2019 Fiscal Year, Defendant Garutti received $292,434 in total compensation from the Company. This included $42,500 in fees earned or paid in cash and $249,934 in stock awards.

43.    The 2022 Proxy Statement stated the following about Defendant Garutti:

*Randy Garutti* has served as a member of our board of directors since July 2017. Since April 2012, Mr. Garutti has served as Chief Executive Officer and on the board of directors of Shake Shack, Inc. ("Shake Shack"). Prior to becoming Chief Executive Officer, Mr. Garutti served as Chief Operating Officer of Shake Shack since January 2010. Before Shake Shack, Mr. Garutti was the Director of Operations for Union Square Hospitality Group, LLC, overseeing the operations for all its restaurants. Additionally, Mr. Garutti currently serves on the boards of directors of USHG Acquisition Corp. and the Columbus Avenue Business Improvement District, a not-for-profit organization. Mr. Garutti holds a B.S. in Hotel Administration from Cornell University's School of Hotel Administration.

Mr. Garutti was selected to serve on our board of directors because of his business expertise and leadership of a global brand.

**Defendant McKelvey**

44.    Defendant McKelvey cofounded the Company and has served as a director since July 2009. According to the 2022 Proxy Statement, as of March 31, 2022, Defendant McKelvey beneficially owned 12,384,086 shares of the Company's common stock, representing 19.87% of the Company's Class B Common Stock, and 10.81% of total voting power. Given that the price

per share of the Company's common stock at the close of trading on March 31, 2022 was $135.60, Defendant McKelvey owned approximately $1.7 billion worth of Block stock.

45.     For the 2021 Fiscal Year, Defendant McKelvey received $289,619 in total compensation from the Company made up entirely of stock awards. For the 2020 Fiscal Year, Defendant McKelvey received $290,255 in total compensation from the Company made up entirely of stock awards. For the 2019 Fiscal Year, Defendant McKelvey received $290,217 in total compensation from the Company made up entirely of stock awards.

46.     The 2022 Proxy Statement stated the following about Defendant McKelvey:

*James McKelvey* is our co-founder and has served as a member of our board of directors since July 2009. Since March 2012, Mr. McKelvey has served in various positions at Mira Smart Conferencing, a digital conferencing company. Mr. McKelvey previously served on the boards of directors of MoneyonMobile, Inc. from May 2016 to August 2018 and Ajax I Holdings, Inc. from October 2020 to August 2021, and currently serves on the boards of directors of a number of privately-held companies, as well as the Federal Reserve Bank of St. Louis. Mr. McKelvey holds a B.S. in Computer Science and a B.A. in Economics from Washington University in St. Louis.

Mr. McKelvey was selected to serve on our board of directors because of the perspective and experience he brings as one of our founders.

**Defendant Meeker**

47.     Defendant Meeker has served as a Company director since June 2011. She also serves as Chair of the Compensation Committee. According to the 2022 Proxy Statement, as of March 31, 2022, Defendant Meeker beneficially owned 406,250 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2022 was $135.60, Defendant Meeker owned approximately $55.1 million worth of Block stock.

48.     For the 2021 Fiscal Year, Defendant Meeker received $304,729 in total compensation from the Company made up entirely of stock awards. For the 2020 Fiscal Year,

Defendant Meeker received $305,503 in total compensation from the Company made up entirely of stock awards. For the 2019 Fiscal Year, Defendant Meeker received $305,369 in total compensation from the Company made up entirely of stock awards.

49.    The 2022 Proxy Statement stated the following about Defendant Meeker:

*Mary Meeker* has served as a member of our board of directors since June 2011. Since January 2019, Ms. Meeker has served as a General Partner of Bond Capital. From December 2010 to December 2018, Ms. Meeker served as a General Partner of Kleiner Perkins Caufield & Byers. From 1991 to 2010, Ms. Meeker worked at Morgan Stanley as a Managing Director and Research Analyst. Ms. Meeker previously served on the boards of directors of LendingClub Corporation from June 2012 to June 2019 and DocuSign, Inc. from July 2012 to June 2019, and currently serves on the boards of directors of Nextdoor Holdings, Inc. and a number of privately-held companies. Ms. Meeker holds a B.A. in Psychology from DePauw University and an M.B.A. from Cornell University.

Ms. Meeker was selected to serve on our board of directors because of her extensive experience advising and analyzing technology companies.

**Defendant Patterson**

50.    Defendant Patterson served as a Company director from November 2017 until her resignation on June 14, 2022. During the Relevant Period, Defendant Patterson served as a member of the Audit and Risk Committee. According to the 2022 Proxy Statement, as of March 31, 2022, Defendant Patterson beneficially owned 13,571 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2022 was $135.60, Defendant Patterson owned approximately $1.8 million worth of Block stock.

51.    For the 2021 Fiscal Year, Defendant Patterson received $302,565 in total compensation from the Company made up entirely of stock awards. For the 2020 Fiscal Year, Defendant Patterson received $305,503 in total compensation from the Company made up entirely of stock awards. For the 2019 Fiscal Year, Defendant Patterson received $302,192 in total

compensation from the Company. This included $12,500 in fees earned or paid in cash and $289,692 in stock awards.

52.    The proxy statement that the Company filed with the SEC on April 29, 2021 (the "2021 Proxy Statement") stated the following about Defendant Patterson:

> *Anna Patterson* has served as a member of our board of directors since November 2017. Since April 2017, Ms. Patterson has served as Founder and Managing Partner at Gradient Ventures, Google's artificial intelligence-focused venture fund, and since September 2010, as a Vice President of Engineering at Google. Prior to that, from January 2007 to September 2010, Ms. Patterson served as Co-Founder and President at Cuil, and from February 2004 to January 2007, as Director of Engineering at Google. Ms. Patterson also currently serves on the National Council at the School of Engineering and Applied Science at Washington University in St. Louis and on the boards of directors of a number of privately-held companies. Ms. Patterson holds a B.S. in Computer Science and Electrical Engineering from Washington University in St. Louis and a Ph.D. in Computer Science from the University of Illinois at Urbana-Champaign.
>
> Ms. Patterson was selected to serve on our board of directors because of her engineering and business experience as well as her financial expertise as a founder of a venture fund.

**<u>Defendant Summers</u>**

53.    Defendant Summers has served as a Company director since June 2011. He also serves as a member of the Audit and Risk Committee. According to the 2022 Proxy Statement, as of March 31, 2022, Defendant Summers beneficially owned 87,939 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2022 was $135.60, Defendant Summers owned approximately $11.9 million worth of Block stock.

54.    For the 2021 Fiscal Year, Defendant Summers received $299,842 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $249,842 in stock awards. For the 2020 Fiscal Year, Defendant Summers received $299,924 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and

$249,924 in stock awards. For the 2019 Fiscal Year, Defendant Summers received $312,434 in total compensation from the Company. This included $62,500 in fees earned or paid in cash and $249,934 in stock awards.

55.     The 2022 Proxy Statement stated the following about Defendant Summers:

*Dr. Lawrence Summers* has served as a member of our board of directors since June 2011. Since January 2011, Dr. Summers has served as the Charles W. Eliot University Professor & President Emeritus of Harvard University and the Weil Director of the Mossaar-Rahmani Center for Business & Government at the Harvard Kennedy School. From January 2009 to December 2010, Dr. Summers served as Director of the National Economic Council for President Obama. Dr. Summers previously served as President of Harvard University, and he has also served in various other senior policy positions, including as Secretary of the Treasury and Vice President of Development Economics and Chief Economist of the World Bank. Dr. Summers previously served on the board of directors of LendingClub Corporation from December 2012 to June 2018, and currently serves as the Chairperson of the International Advisory Board at Santander Bank and on the boards of directors of Skillsoft Corp. and Doma Holdings, Inc., as well as several privately-held companies. Dr. Summers holds a B.S. in Economics from Massachusetts Institute of Technology and a Ph.D. in Economics from Harvard University.

Dr. Summers was selected to serve on our board of directors because of his extensive policy experience and in-depth knowledge of macroeconomic trends.

**Defendant Viniar**

56.     Defendant Viniar served as a Company director from October 2013 until his resignation on June 14, 2022. During the Relevant Period, Defendant Viniar served as Chair of the Audit and Risk Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2022 Proxy Statement, as of March 31, 2022, Defendant Viniar beneficially owned 325,266 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2022 was $135.60, Defendant Viniar owned approximately $44.1 million worth of Block stock.

57.    For the 2021 Fiscal Year, Defendant Viniar received $382,102 in total compensation from the Company made up entirely of stock awards. For the 2020 Fiscal Year, Defendant Viniar received $383,014 in total compensation from the Company made up entirely of stock awards. For the 2019 Fiscal Year, Defendant Viniar received $382,931 in total compensation from the Company made up entirely of stock awards.

58.    The 2021 Proxy Statement stated the following about Defendant Viniar:

*David Viniar* has served as a member of our board of directors since October 2013. From August 1980 until his retirement in January 2013, Mr. Viniar served in various positions at The Goldman Sachs Group, including as Chief Financial Officer, Executive Vice President and Head of the Operations, Technology, Finance and Services Division. Mr. Viniar currently serves on the boards of directors of The Goldman Sachs Group and a number of privately-held companies. Mr. Viniar holds a B.A. in Economics from Union College and an M.B.A. from Harvard Business School.

Mr. Viniar was selected to serve on our board of directors because of his financial, risk management and business expertise.

### **Defendant Walker**

59.    Defendant Walker has served as a Company director since June 2020. He also serves as a member of the Nominating and Corporate Governance Committee. According to the 2022 Proxy Statement, as of March 31, 2022, Defendant Walker beneficially owned 2,968 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2022 was $135.60, Defendant Walker owned approximately $402,000 worth of Block stock.

60.    For the 2021 Fiscal Year, Defendant Walker received $295,131 in total compensation from the Company made up entirely of stock awards. For the 2020 Fiscal Year, Defendant Walker received $263,366 in total compensation from the Company. This included $1,648 in fees earned or paid in cash and $261,718 in stock awards.

61.    The 2022 Proxy Statement stated the following about Defendant Walker:

*Darren Walker* has served as a member of our board of directors since June 2020. Since 2013, Mr. Walker has served as the President of the Ford Foundation, a philanthropic organization. From 2010 to 2013, he served as Vice President for Education, Creativity and Free Expression at the Ford Foundation. Prior to the Ford Foundation, Mr. Walker worked for the Rockefeller Foundation, a philanthropic organization, and served as a Vice President responsible for foundation initiatives from 2005 to 2010. Mr. Walker currently serves on the boards of directors of Ralph Lauren Corporation, PepsiCo, Inc. and on the boards of directors of several non-profit organizations, including the National Gallery of Art, Lincoln Center for the Performing Arts, Friends of the High Line, the Smithsonian National Museum of African American History & Culture and Carnegie Hall. Mr. Walker is also a member of the Council on Foreign Relations and the American Academy of Arts and Sciences. Mr. Walker holds B.A., B.S. and J.D. degrees from the University of Texas at Austin.

Mr. Walker was selected to serve on our board of directors because of his philanthropic experience and work around social justice, which is aligned with Block's purpose of economic empowerment.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

62.    By reason of their positions as officers, directors, and/or fiduciaries of Block and because of their ability to control the business and corporate affairs of Block, the Individual Defendants owed Block and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Block in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Block and its shareholders so as to benefit all shareholders equally.

63.    Each director and officer of the Company owes to Block and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

64.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Block, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

65.     To discharge their duties, the officers and directors of Block were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

66.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Block, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Block's Board at all relevant times.

67.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false

information regarding the Company's business, prospects, and operations, and had a duty to cause

the Company to disclose in its regulatory filings with the SEC all those facts described in this

complaint that it failed to disclose, so that the market price of the Company's common stock would

be based upon truthful and accurate information. Further, they had a duty to ensure the Company

remained in compliance with all applicable laws.

68.     To discharge their duties, the officers and directors of Block were required to

exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of the Company. By virtue of such duties, the officers and directors of Block were required

to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent

manner in accordance with the laws and regulations of Delaware and the United States, and

pursuant to Block's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so

as to make it possible to provide the highest quality performance of its business, to avoid wasting

the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Block conducted its operations, and, upon

receipt of notice or information of imprudent or unsound conditions or practices, to make

reasonable inquiry in connection therewith, and to take steps to correct such conditions or

practices;

(d)     establish and maintain systematic and accurate records and reports of the

business and internal affairs of Block and procedures for the reporting of the business and internal

affairs to the Board and to periodically investigate, or cause independent investigation to be made

of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Block's operations would comply with all applicable laws and Block's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

69.     Each of the Individual Defendants further owed to Block and the shareholders the duty of loyalty requiring that each favor Block's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

70.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Block and were at all times acting within the course and scope of such agency.

71.     Because of their advisory, executive, managerial, directorial, and controlling positions with Block, each of the Individual Defendants had access to adverse, non-public information about the Company.

72.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Block.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

73.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

74.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

75.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Block was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

76.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

77.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Block, and was at all times acting within the course and scope of such agency.

## BLOCK'S CODE OF CONDUCT

78.    Block's Code of Conduct provides Company employees with a guide for approaching work "lawfully, honestly, ethically, and in the best interest of Block, Inc." The Code of Conduct states that "it is critical that all employees, officers, and directors of Block [] read, understand, and abide by this Code."

79.    The Code of Conduct states the following regarding the responsibilities of the Company's committees:

> The Board of Directors, in conjunction with the Audit and Risk Committee and the Nominating and Corporate Governance Committee, is ultimately responsible for administering this Code, and they have delegated day-to-day responsibility for administering and interpreting this Code to our General Counsel. The Nominating and Corporate Governance Committee is responsible for reviewing and monitoring compliance with this Code, including oversight over the establishment of procedures for the prompt internal reporting of violations of this Code. The Audit and Risk Committee will oversee the review of any complaints and submissions that have been brought to the Audit and Risk Committee by our General Counsel under this Code.

80.    In a section titled "Maintain Confidentiality," the Code of Conduct states the following, in relevant part:

Protecting Block's confidential information is a critical responsibility for all individuals who perform work for Block, and violations of these obligations can have a serious impact on our business. While we are proud of all of Block's accomplishments, we need to protect Block's confidential information and avoid communicating any material nonpublic information ("MNPI") about Block to anyone outside of Block who is not bound by a confidentiality obligation to us ("Third Parties"). Find an overview of MNPI here. Even if you have access to confidential information, you should not access, use, or share confidential information (or your opinions about such information) with people outside Block or people inside of Block who do not have a business need to know this information, and only do so in compliance with our Data Policy.

81.    In a section titled "Report Potential Violations," the Code of Conduct states the following, in relevant part:

Employees are responsible for fostering a safe, respectful, and productive environment. This means that you should report any concerns you have regarding a violation of Block's policies, including: (1) reporting suspected legal violations; (2) providing truthful information in connection with an inquiry or investigation by the Employee Relations team, the Informational Security team, the Incident Response team, an external investigator, a court, law enforcement, or any other governmental body; and (3) identifying potential violations of the Code or the Employee Handbook relevant to your locale.

* * *

The integrity of our business practices and financial information is paramount. Our financial information guides the decisions of our management team and Board of Directors. In parallel, our stockholders and the financial markets rely on our financial information as well. For these reasons, we must maintain a workplace where individuals can raise concerns free of any retaliation, discrimination, or harassment when they reasonably believe that they are aware of questionable accounting, internal accounting controls, or other financial matters, or the reporting of fraudulent financial information (collectively, "Fraudulent Activities").

82.    In a section titled, "Antitrust and Fair Dealing," the Code of Conduct states the following, in relevant part:

Competing vigorously, yet lawfully, with competitors and establishing advantageous, but fair, business relationships with customers and suppliers is a part of the foundation for long-term success. That being said, unlawful and unethical conduct, which may lead to short-term gains, would damage Block's reputation and long-term business prospects. Accordingly, you must comply with antitrust and competition laws and deal ethically and lawfully with our customers, suppliers, competitors, employees, and contractors in all business dealings on our behalf. You should not take unfair advantage of another person in business dealings on our

behalf through the abuse of privileged or confidential information or through improper manipulation, concealment or misrepresentation of material facts, or any other unfair dealing practices.

83.    In a section titled, "Insider Trading Policy," the Code of Conduct states the following:

> You may not trade or enable others to trade Block stock or stock of another company, such as a customer, supplier, competitor, potential acquisition or alliance, while in possession of MNPI about that company. Insider trading not only violates this Code, it also violates the law and can result in criminal consequences.

84.    In a section titled, "Avoid Conflicts of Interest," the Code of Conduct states the following, in relevant part:

> When faced with a situation in which you have competing loyalties between Block's interests and your personal interests that could benefit you, your friends, or family members, your decisions and actions should be based on Block's interests. You should avoid any situation that may create an actual or perceived conflict of interest.
>
> * * *
>
> *Corporate Opportunities*: Obtain pre-approval before:
> • diverting to yourself or to others any opportunities that are discovered through your work at Block;
> • using Block's property or information or your position for personal gain; or
> • competing with Block
>
> * * *
>
> *Disclose Potential Conflicts and Report Concerns*: You must disclose any actual or potential conflict of interest (or even the appearance of an actual or potential conflict of interest), including but not limited to the above situations, to your HRBP. You must promptly take action to eliminate a conflict of interest if Block asks you to do so. If you become aware of any actual or potential conflict of interest, bribe/kickback, or other ethical concern at Block, immediately report your concern to your lead, your HRBP, the People Lead, or the General Counsel, even if you are not sure whether the conduct violates this Code or any other Block policy. Block does not permit Retaliation of any kind for reports of misconduct made in good faith or cooperation in any investigation of such reports.

85.    In a section titled, "Security and Privacy," the Code of Conduct states the following:

> You have a shared duty to protect Block's intellectual property, MNPI, personally identifiable information, other data described in go/datapolicy (collectively, "Block Data") and other business assets. ***We take our intellectual property, Block Data,***

**business systems, and network security very seriously. Good security, working practices, and procedures for Block property, in all its forms, are critical in protecting Block Data and intellectual property development that fuels Block's growth, the livelihood of employees, and our collective investment in Block.** Block's files, networks, software, internet access, internet browser programs, email, voice mail, and other business equipment and resources are provided for business use, and they are the exclusive property of Block. Misuse of such property is not tolerated. We reserve the right to monitor your use of Block systems (including email and Slack communications) and access to Block data to secure our systems, monitor compliance with this Code and other Block policies, and protect our rights and the rights of our customers.

(Emphasis added.)

86.     In violation of the Code of Conduct, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to engage in the Cybersecurity Misconduct, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, and aiding and abetting thereof.  Moreover, one of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, protect Block Data, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## BLOCK'S AUDIT AND RISK COMMITTEE CHARTER

87.     The Company also maintains an Audit and Risk Committee Charter (the "Charter"). Regarding the Company's annual Forms 10-K and quarterly Forms 10-Q, the Charter states that: "[t]he Audit and Risk Committee shall review and discuss the following with management and the Independent Auditor, as applicable: [t]he Company's annual audited and quarterly financial

statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in

'Management's Discussion and Analysis of Financial Condition and Results of Operations.'"

88.     Moreover, with respect to the Company's earnings press releases, the Charter

provides that "[t]he Audit and Risk Committee shall review and discuss earnings press releases

(with particular attention to any use of non-GAAP financial measures), as well as financial

information and earnings guidance provided to the public, analysts and ratings agencies."

89.     On the topic of "Risks," the Charter states that:

> The Audit and Risk Committee shall review and discuss with management and the
> Independent Auditor the Company's major financial and other risk exposures,
> particularly financial reporting, tax, accounting, disclosure controls and procedures,
> internal control over financial reporting, investment guidelines and credit and
> liquidity matters, the Company's programs and policies relating to legal and
> regulatory compliance, data privacy, data security, cybersecurity and operational
> security and reliability, and the steps management has taken to monitor and control
> those exposures, including the Company's guidelines and policies with respect to
> risk assessment and risk management. The Audit and Risk Committee will also
> review the Company's risk management framework and programs, as well as the
> framework by which management discusses the Company's risk profile and risk
> exposures with the Board and its committees.

90.     Finally, with respect to the Company's "Internal Control Over Financial Reporting

and Disclosure Controls and Procedures," the Charter provides that: "The Audit and Risk

Committee shall review and discuss the following with management and the Independent Auditor

as applicable: the reports and certifications regarding internal control over financial reporting and

disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Relevant Background

#### Block and Cash App Investing

91.     Block, formerly known as Square, Inc., is a Delaware corporation founded in 2009

by Defendants Dorsey and McKelvey that specializes in technology designed to create financial

service tools for customers. These financial service tools include Square, which provides commerce solutions and banking services to businesses, and Cash App, which offers mobile payment services to individuals. In addition, Block has been a publicly traded company since it effected its initial public offering ("IPO") in November 2015.

92.    Cash App Investing is a subsidiary of Block and operates as the Company's stock trading platform. Cash App Investing maintains a valuable list of its customers, which includes full customer names and brokerage account numbers, brokerage portfolio values, broker portfolio holdings, and stock trading activity. Keeping this information private and secure is critical to the Company's business, as unauthorized access to it would make customers extremely vulnerable to fraudulent activities perpetrated against them and subsequent financial losses.

***Block's Promises to Protect Customers' Privacy***

93.    Throughout the Relevant Period, the Company promised customers that it would keep their Personal Information secure from unauthorized access.

94.    For example, on January 26, 2022, Block and its affiliates (collectively, "Cash App"), issued a privacy notice to investors (the "Privacy Notice"). The Privacy Notice was intended to explain to customers "how [Block] and [its] affiliates collect, use, disclose, transfer, store, retain or otherwise process [customer information] when [customers] download Cash App [] and sign up for a Cash App account."[2]

95.    In a section titled "How We Secure Information," the Privacy Notice stated the following:

> We take reasonable measures, including administrative, technical, and physical safeguards, to protect your information from loss, theft, and misuse, and unauthorized access, disclosure, alteration, and destruction. Nevertheless, the internet is not a 100% secure environment, and we cannot guarantee absolute security of the transmission or storage of your information. We hold information

---

[2] https://cash.app/legal/us/en-us/privacy

about you both at our own premises and with the assistance of third-party service providers.[3]

96.    However, Defendants violated the Privacy Notice by failing to implement proper cybersecurity to protect customers' Personal Information, resulting in the Data Breach, discussed below.

### Block's Cybersecurity Misconduct

97.    Throughout the Relevant Period, the Defendants participated in the Cybersecurity Misconduct, which resulted in the Company's failure to have adequate cybersecurity in place to protect customers' Personal Information from unauthorized access. The Cybersecurity Misconduct consisted of: (1) Block failing to follow industry-wide cybersecurity standards; (2) Block ignoring both the value of customers' Personal Information and the risks associated with its unauthorized access; and (3) the Company failing to comply with FTC guidelines by engaging in "unfair or deceptive acts or practices in or affecting commerce."

### *Block Failed to Follow Industry-Wide Cybersecurity Standards*

98.    As the Company admits in the Privacy Notice, Block "collect[s], use[s], disclose[s], transfer[s], store[s], [and] retain[s]" the Personal Information of its customers.[4]

99.    Under widely accepted industry standards, Block was required to protect customers' Personal Information from unauthorized access by Company outsiders.

100.    For years, Block knew that proper human management of sensitive customer information was critical to protecting against data breaches. For example, in 2021, Verizon conducted a study which revealed that "almost half of the breaches in [the financial sector] were

---

[3] *Id.*
[4] *Id.*

caused by [i]nternal [a]ctors committing various types of [e]rrors."[5] Further, a recent study by IBM revealed that "human error is the main cause of 95% of cyber security breaches."[6] As a result, Block knew that, under widely-accepted industry standards, preventing this type of human error was critical to preventing a data breach. For example, the Cybersecurity and Infrastructure Security Agency ("CISA") of the U.S. government has stated that "[p]revention is the most effective defense against ransomware."[7] Even though Defendants knew of the risks associated with human error and the importance of preventing them, the Company failed to establish adequate cybersecurity to protect customers' Personal Information from unauthorized access.

101.    Throughout the Relevant Period, there were various cybersecurity measures the Company could have implemented to protect customers' Personal Information from unauthorized access by Company outsiders. For example, the Microsoft Threat Protection Intelligence Team recommends that companies, among other things, apply the latest security updates, use threat and vulnerability management, and monitor for adversarial activities in order to protect private information.[8]

102.    By implementing these cybersecurity measures, Defendants could have prevented the Data Breach and its resulting harm to customers and investors. However, because Defendants failed to implement adequate cybersecurity measures, customers' Personal Information was vulnerable to improper access by Company outsiders throughout the Relevant Period, thus resulting in the Data Breach.

---

[5]https://www.verizon.com/business/resources/reports/dbir/2021/data-breach-statistics-byindustry/
financial-services-data-breaches/.
[6] https://blog.usecure.io/the-role-of-human-error-in-successful-cyber-security-breaches
[7] https://twitter.com/cisagov/status/1392541355893743626?lang=nl
[8]https://www.microsoft.com/en-us/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/

### *Block Ignored the Value and Risks Associated with Customers' Personal Information*

103.    Upon the customers' Personal Information being revealed to unauthorized Company outsiders, it was almost immediately used for fraudulent activities, thus demonstrating its significant monetary value.

104.    Throughout the Relevant Period, Block was aware of the sensitivity of customers' Personal Information and of its value to those wishing to use it improperly. For example, the FTC has stated that scammers use this type of information to commit identity theft, often "buy[ing] things with [customers'] credit cards" or "pretending to be [the customer] if [the identity thief] [is] arrested."[9] Additionally, criminals are able to sell customers' Personal Information for significant profits on the digital black market, which functions as an "illegal marketplace for drugs, firearms, [and] stolen data."[10]

105.    Further, the FTC has stated that it now considers sensitive data to be a form of currency. For example, one former FTC commissioner noted in a report that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.

106.    In addition, this valuable Personal Information can be used by thieves in various ways. In fact, thieves are often able to access customers' Personal Information through obtaining smaller seemingly unimportant pieces of data and tracing that data back to the customer. For example, the FTC stated in a staff report that "technological advances and the ability to combine disparate pieces of data can lead to the identification of a customer" even if "the individual pieces of data do not constitute [Personal Information]."[11] Once a thief has access to this sensitive data,

---

[9] https://consumer.ftc.gov/articles/what-know-about-identity-theft
[10] https://shuftipro.com/blog/the-digital-black-market-for-identity-data/
[11] https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-report-

the customer is left vulnerable to both fraud and identity theft. In fact, according to a February 2022 FTC report, "over the past three years, annual reports of identity theft and fraud have doubled to more than 5.7 million."[12] Further, risks and costs associated with identity theft are often an ongoing concern for affected customers, as "[o]n average, it can take 100 to 200 hours over six months to undo identity theft."[13]

107.    As a result, Defendants knew of the sensitivity of customers' Personal Information and of the risks associated with this information being accessed by unauthorized Company outsiders. Still, Defendants failed to implement proper cybersecurity to protect this information, thus resulting in the Data Breach.

### Block Failed to Comply with FTC Guidelines

108.    The Federal Trade Commission Act ("FTC Act") (15 U.S.C. §45) prohibits companies from engaging in "unfair or deceptive acts or practices in or affecting commerce." In addition, the FTC has acknowledged that a company's failure to implement proper cybersecurity to protect customers' private data is an "unfair practice" which violates the FTC Act.

109.    The FTC has repeatedly emphasized the importance of companies implementing proper cybersecurity by providing useful resources for businesses. For example, the FTC's website contains a section titled "Cybersecurity Basics" designed to "help protect your business and reduce the risk of a cyber attack."[14] In that section, the FTC recommends that, at the bare minimum, companies update their software, secure their files, require passwords, encrypt devices, and use

---

protecting-consumer-privacy-era-rapid-change-recommendations/120326privacyreport.pdf
[12]https://www.aura.com/learn/how-long-does-it-take-to-recover-from-identity-theft#:~:text=Identity%20theft%20is%20the%20crime,(FTC)%20%5B*%5D.
[13]https://www.identityhawk.com/identity-theft-recovery-time/#:~:text=The%20Federal%20Trade%20Commission%20(FTC,and%20200%20hours%20of%20work.
[14] https://www.ftc.gov/business-guidance/small-businesses/cybersecurity/basics

multi-factor authentication to protect against possible cyber-attacks.[15] Further, the FTC suggests that companies "make smart security [their] business as usual" by requiring strong passwords, training all staff, and having a plan for "saving data, running the business, and notifying customers if [a company] experience[s] a breach."[16]

110.    However, throughout the Relevant Period, Defendants failed to implement these basic cybersecurity measures to protect customers' Personal Information, thus violating the FTC Act's prohibition on engaging in "unfair or deceptive acts or practices in or affecting commerce."

### The Data Breach

111.    On December 10, 2021, Block discovered that a former Company employee had downloaded several reports of its subsidiary, Cash App Investing, that contained the Personal Information of Cash App Investing's U.S. customers. The former employee did not have the Company's permission to access this data.

112.    On April 4, 2022, the Company disclosed the Data Breach to affected customers and the public when it filed a Form 8-K with the SEC. The Form 8-K revealed that the information the former employee had downloaded "included full name and brokerage account number (this is the unique identification number associated with a customer's stock activity on Cash App Investing), and for some customers also included brokerage portfolio value, brokerage portfolio holdings and/or stock trading activity for one trading day." The Form 8-K further revealed that Cash App Investing was "contacting approximately 8.2 million current and former customers to provide them information about this incident and sharing resources with them to answer their questions."

---

[15] *Id.*
[16] *Id.*

113.     The Company failed to explain the four-month delay between the Company's initial discovery of the Data Breach and its belated notification of the breach to affected customers and to the public. Further, the Company failed to disclose how the former employee was able to access customers' Personal Information or how the Company discovered the Data Breach.

114.     As a result of the Data Breach, a consumer class action was brought in the United States District Court for the Northern District of California on August 23, 2022 against Block and Cash App Investing for "their failure to exercise reasonable care in securing and safeguarding consumer information" in connection with the Data Breach.

**<u>False and Misleading Statements</u>**

***November 4, 2021 Form 10-Q***

115.     On November 4, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2021 (the "3Q 2021 10-Q"), which was signed by Defendants Dorsey and Ahuja.

116.     Attached to the 3Q 2021 10-Q were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Dorsey and Ahuja attesting to the accuracy of the 3Q 2021 10-Q.

117.     The 3Q 2021 10-Q noted several operational risks that the Company was facing, including "real or perceived security breaches or incidents or human error in administering our software, hardware, and systems."

118.     The 3Q 2021 10-Q stated the following regarding potential security breaches:

***Our products and services may not function as intended due to errors in our software, hardware, and systems, product defects, or due to security breaches or incidents or human error in administering these systems, which could materially and adversely affect our business.***

Our software, hardware, systems, and processes may contain undetected errors or vulnerabilities that could have a material adverse effect on our business,

particularly to the extent such errors or vulnerabilities are not detected and remedied quickly. We have from time to time found defects in our customer-facing software and hardware, internal systems, and technical integrations with third-party systems, and new errors or vulnerabilities may be introduced in the future. If there are such errors or defects in our software, hardware, or systems, we may face negative publicity, government investigations, and litigation.

(Emphasis in original.)

119.    The 3Q 2021 10-Q also stated that "[a]s [the Company's] hardware and software services continue to increase in size and complexity, and as we integrate new, acquired subsidiaries with different technology stacks and practices, these risks may correspondingly increase as well."

120.    The 3Q 2021 10-Q stated the following regarding factors that "increase the possibility of errors" with the Company's products and services:

In addition, we provide frequent incremental releases of product and service updates and functional enhancements, which increase the possibility of errors. The products and services we provide are designed to process complex transactions and deliver reports and other information related to those transactions, all at high volumes and processing speeds. ***Any errors, data leaks, security breaches or incidents, disruptions in services, or other performance problems with our products or services caused by external or internal actors could hurt our reputation and damage our customers' businesses.*** Software and system errors, or human error, could delay or inhibit settlement of payments, result in over settlement, cause reporting errors, or prevent us from collecting transaction-based fees, or negatively impact our ability to serve our customers, all of which have occurred in the past. ***Similarly, security breaches or incidents such as cyber-attacks or identity theft could disrupt the proper functioning of our software products or services, cause errors, allow loss or unavailability of, unauthorized access to, or disclosure of, proprietary, confidential or otherwise sensitive information of ours or our customers, and other destructive outcomes.***

\* \* \*

Any of the foregoing issues could lead to product recalls and inventory shortages, result in costly and time-consuming efforts to redesign and redistribute our products, give rise to regulatory inquiries and investigations, and result in lawsuits and other liabilities and losses, which could have a material and adverse effect on our business.

(Emphasis added.)

121.    The 3Q 2021 10-Q stated the following regarding hackers and other "malicious actors":

> ***Additionally, electronic payment, hardware, and software products and services, including ours, have been, and could continue to be in the future, specifically targeted and penetrated or disrupted by hackers and other malicious actors.*** Because the techniques used to obtain unauthorized access to data, products, and services and to disable, degrade, or sabotage them change frequently and may be difficult to detect or remediate for long periods of time, we and our customers may be unable to anticipate these techniques or implement adequate preventative measures to stop them. ***If we or our sellers or other customers are unable to anticipate or prevent these attacks, our sellers' or other customers may be harmed, our reputation could be damaged, and we could incur significant liability.***

(Emphasis added.)

122.    The statements in paragraphs ¶¶ 116-121 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) the Company was engaged in the Cybersecurity Misconduct; (2) because of this, a former employee was able to download various Cash App Investing reports, giving this employee access to the Personal Information of more than 8.2 million Cash App Investing customers; (3) due to the foregoing, the Company was reasonably likely to suffer significant damage, including reputational harm; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### February 24, 2022 Form 10-K

123.    On February 24, 2022, the Company filed its annual report on Form 10-K with the SEC for the period ended December 31, 2021 (the "2021 10-K"), which was signed by all of the

Individual Defendants. The 2021 10-K contained the same false and misleading statements listed above in paragraphs ¶¶ 116-121.

124.    The statements in the 2021 10-K were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) the Company was engaged in the Cybersecurity Misconduct; (2) because of this, a former employee was able to download various Cash App Investing reports, giving this employee access to the Personal Information of more than 8.2 million Cash App Investing customers; (3) due to the foregoing, the Company was reasonably likely to suffer significant damage, including reputational harm; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *February 24, 2022 Form 8-K and Letter to Shareholders*

125.    Also on February 24, 2022, the Company filed a Form 8-K with the SEC. Attached to the Form 8-K was a letter that had been sent to shareholders (the "Letter") that same day detailing the Company's highlights from the fourth quarter of 2021. Notably, the Letter failed to disclose the Data Breach.

126.    The above omission identified in ¶ 125 was materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified omission failed to disclose that: (1) the Company was engaged in the Cybersecurity Misconduct; (2) because of this, a former employee was able to download various Cash App Investing reports, giving this employee access to the Personal Information of more than 8.2 million Cash App Investing customers; (3) due to the foregoing, the Company was reasonably likely to suffer significant damage, including reputational harm; and (4) the Company failed to

maintain internal controls. As a result of the foregoing, the Company's public statements were

materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Emerges

127.    On April 4, 2022, the Company filed a Form 8-K with the SEC which notified

affected customers and investors of the Data Breach.

128.    In regards to the Data Breach, the Form 8-K said the following:

On April 4, 2022, Block, Inc. (the "Company") announced that it recently determined that a former employee downloaded certain reports of its subsidiary Cash App Investing LLC ("Cash App Investing") on December 10, 2021 that contained some U.S. customer information. *While this employee had regular access to these reports as part of their past job responsibilities, in this instance these reports were accessed without permission after their employment ended.*

*The information in the reports included full name and brokerage account number* (this is the unique identification number associated with a customer's stock activity on Cash App Investing), *and for some customers also included brokerage portfolio value, brokerage portfolio holdings and/or stock trading activity for one trading day.*

* * *

Upon discovery, the Company and its outside counsel launched an investigation with the help of a leading forensics firm. *Cash App Investing is contacting approximately 8.2 million current and former customers to provide them with information about this incident and sharing resources with them to answer their questions.* The Company is also notifying the applicable regulatory authorities and has notified law enforcement

(Emphasis added.)

129.    On this news, the price of the Company's stock fell $9.27 per share, or 6.4%, from

$145.19 per share at the close of trading on April 4, 2022, to $135.92 per share at the close of

trading on April 5, 2022.

130.    On April 11, 2022, Defendants Viniar and Patterson informed the Company that

they would not stand for re-election at the Annual Meeting. The Company revealed this

information to the public by filing a Form 8-K with the SEC on April 15, 2022. Although the

Company stated that Defendants Viniar's and Patterson's decisions to step down from the Board were "a result of wanting to devote more time to other professional and personal activities," these departures occurred only one week after the public disclosure of the Data Breach and the Company's resulting stock drop.

131.    As a result of Defendants Viniar's and Patterson's resignations, the Board decreased its size from thirteen to eleven directors, which became effective at the Annual Meeting.

**Repurchases During the Relevant Period**

132.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $196.3 million to repurchase approximately 1,207,221 shares of its own common stock at artificially inflated prices from November 2021 through March 2022.

133.    According to the 2021 10-K, between November 1, 2021 and November 30, 2021, the Company purchased 14,493 shares of its common stock for approximately $3,696,295 at an average price of $255.04 per share.[17]

134.    As the Company's stock was actually worth only $135.92 per share, the price at closing on April 5, 2022, the Company overpaid by approximately $1,726,406 for repurchases of its own stock between November 1, 2021 and November 30, 2021.

135.    According to the 2021 10-K, between December 1, 2021 and December 31, 2021, the Company purchased 192 shares of its common stock for approximately $46,846 at an average price of $243.99 per share.

---

[17]  Upon information and belief, these shares were repurchased during the Relevant Period.

136.    As the Company's stock was actually worth only $135.92 per share, the price at closing on April 5, 2022, the Company overpaid by approximately $20,749 for repurchases of its own stock between December 1, 2021 and December 31, 2021.

137.    According to the Form 10-Q the Company filed with the SEC on May 5, 2022 for the quarterly period ended March 31, 2022 (the "1Q 2022 10-Q"), between January 1, 2022 and January 31, 2022, the Company purchased 3,814 shares of its common stock for approximately $615,999 at an average price of $161.51 per share.

138.    As the Company's stock was actually worth only $135.92 per share, the price at closing on April 5, 2022, the Company overpaid by approximately $97,600 for repurchases of its own stock between January 1, 2022 and January 31, 2022.

139.    According to the 1Q 2022 10-Q, between February 1, 2022 and February 28, 2022, the Company purchased 375,968 shares of its common stock for approximately $60,722,592 at an average price of $161.51 per share.

140.    As the Company's stock was actually worth only $135.92 per share, the price at closing on April 5, 2022, the Company overpaid by approximately $9,621,021 for repurchases of its own stock between February 1, 2022 and February 28, 2022.

141.    According to the 1Q 2022 10-Q, between March 1, 2022 and March 31, 2022, the Company purchased 812,754 shares of its common stock for approximately $131,267,899 at an average price of $161.51 per share.

142.    As the Company's stock was actually worth only $135.92 per share, the price at closing on April 5, 2022, the Company overpaid by approximately $20,798,375 for repurchases of its own stock between March 1, 2022 and March 31, 2022.

143.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $32.3 million.

## DAMAGES TO BLOCK

144.    As a direct and proximate result of the Individual Defendants' conduct, Block has lost and will continue to lose and expend many millions of dollars.

145.    Such losses include nearly $32.3 million the Company overpaid when it repurchased its own common stock at artificially inflated prices during the Relevant Period before the fraud was exposed.

146.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

147.    As a direct and proximate result of the Individual Defendants' conduct, Block has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

148.    Plaintiff brings this action derivatively and for the benefit of Block to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Block, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

149.    Block is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

150.    Plaintiff is, and has been at all relevant times, a shareholder of Block. Plaintiff will adequately and fairly represent the interests of Block in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

151.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

152.    A pre-suit demand on the Board of Block is futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following eleven individuals: Defendants Dorsey, Botha, Brooks, Deighton, Garutti, McKelvey, Meeker, Summers, and Walker (the "Director Defendants"), along with non-parties Sharon Rothstein and Shawn Carter (together with the Director Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to six of the eleven Directors that were on the Board at the time of the filing of this complaint.

153.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to engage in the Cybersecurity Misconduct, to make and/or cause the Company to make false and misleading statements and omissions of material fact, and, at the same time, to cause the Company to overpay by nearly $32.3 million for repurchases of its own stock, all of which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

154.     In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in causing the Company to engage the Cybersecurity Misconduct and in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

155.     Additional reasons that demand on Defendant Dorsey is futile follow. Defendant Dorsey is the Company's CEO, the Chairman of the Board, and a controlling shareholder of the Company. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Dorsey with his principal occupation for which he receives handsome compensation. As CEO, Defendant Dorsey is ultimately responsible for the Company's engagement in the Cybersecurity Misconduct and all of the false and misleading statements and omissions that were made during the Relevant Period, including those which he signed in the 3Q 2021 10-Q and the 2021 10-K—for which he also signed SOX certifications. As the Company's highest officer and as the trusted Board Chairman, Defendant Dorsey conducted little, if any, oversight of the schemes to cause the Company to engage in the Cybersecurity Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Dorsey is a defendant in the Securities Class Action. For these reasons, Defendant Dorsey breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

156.    Additional reasons that demand on Defendant Botha is futile follow. Defendant Botha has served as a Company director since January 2011 and has been the Company's Lead Independent Director since June 14, 2022. He also serves as a member of the Audit and Risk Committee and the Compensation Committee. Defendant Botha has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Cybersecurity Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Botha signed the 2021 10-K which contained false and misleading statements. For these reasons, Defendant Botha breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

157.    Additional reasons that demand on Defendant Brooks is futile follow. Defendant Brooks has served as a Company director since October 2019. She also serves as a member of the Nominating and Corporate Governance Committee. Defendant Brooks has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Cybersecurity Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Brooks signed the 2021 10-K which contained false and misleading statements. For these reasons, Defendant Brooks breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

158.     Additional reasons that demand on Defendant Deighton is futile follow. Defendant Deighton has served as a Company director since May 2016. Defendant Deighton also serves as Chair of the Audit and Risk Committee and as a member of the Compensation Committee. Additionally, Defendant Deighton has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Cybersecurity Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Deighton signed the 2021 10-K which contained false and misleading statements. For these reasons, Defendant Deighton breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

159.     Additional reasons that demand on Defendant Garutti is futile follow. Defendant Garutti has served as a Company director since July 2017. Defendant Garutti also serves as Chair of the Nominating and Corporate Governance Committee. Additionally, Defendant Garutti has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Cybersecurity Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Garutti signed the 2021 10-K which contained false and misleading statements. For these reasons, Defendant Garutti breached his fiduciary duties, faces a substantial likelihood of

liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

160.    Additional reasons that demand on Defendant McKelvey is futile follow. Defendant McKelvey cofounded the Company and has served as a Company director since July 2009. Thus, as the Company admits, he is a non-independent director. Additionally, Defendant McKelvey has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Cybersecurity Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant McKelvey signed the 2021 10-K which contained false and misleading statements. For these reasons, Defendant McKelvey breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

161.    Additional reasons that demand on Defendant Meeker is futile follow. Defendant Meeker has served as a Company director since June 2011. She also serves as Chair of the Compensation Committee. Defendant Meeker has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Cybersecurity Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Meeker signed the 2021 10-K which contained false and misleading statements. For these reasons, Defendant Meeker breached her fiduciary

duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

162.    Additional reasons that demand on Defendant Summers is futile follow. Defendant Summers has served as a Company director since June 2011. He also serves as a member of the Audit and Risk Committee. Additionally, Defendant Summers has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Cybersecurity Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Summers signed the 2021 10-K which contained false and misleading statements. For these reasons, Defendant Summers breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

163.    Additional reasons that demand on Defendant Walker is futile follow. Defendant Walker has served as a Company director since June 2020. He also serves as a member of the Nominating and Corporate Governance Committee. Additionally, Defendant Walker has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Cybersecurity Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Walker signed the 2021 10-K which contained false and misleading statements. For these reasons,

Defendant Walker breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

164.    Additional reasons that demand on the Board is futile follow.

165.    Each of the Director Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by millions of dollars for its own common stock during the Relevant Period. The Director Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

166.    Demand on the Board is also futile due to a series of related party transactions entered into between the Company and various Directors. For example, during the year ended December 31, 2021, the Company purchased approximately $2.4 million of marketing and advertising services from Twitter. Defendant Dorsey is a co-founder and former CEO of Twitter and, at the time of the Company's purchase, was a director of Twitter. Twitter has done substantial business with Block, making Defendant Dorsey a party to numerous related party transactions. The history of business between the two companies renders Defendant Dorsey unable to disinterestedly and independently consider commencing litigation against himself and the other Individual Defendants that provide his company with additional business.

167.    Additionally, the Company is party to an amended and restated enterprise services agreement and a Cash App boost agreement (the "Cash App Boosts Partnership") with Shake Shack Enterprises, LLC, a subsidiary of Shake Shack Inc. ("Shake Shack"), pursuant to which the Company provides certain products and services related to payment processing, software as a

service, hardware and instant rewards (collectively, the "Shake Shack Services"). In January 2021, the Company extended its Cash Boosts Partnership with Shake Shack. Further, during the fiscal year ended December 31, 2021, the Company received approximately $2.9 million in revenue from the Shake Shack Services and Cash Boosts Partnership and made approximately $25,000 in payments to Shake Shack in connection with the Cash Boosts Partnership. In addition, a subsidiary of Shake Shack was sued in federal court for allegedly infringing a patent owned by Electronic Receipts Delivery Systems, LLC ("ERDS") because of its use of one of the Company's applications to send out digital receipts. Because Shake Shack was sued for allegedly using one of the Company's products, in 2020 the Company agreed to defend Shake Shack against ERDS and to indemnify Shake Shack for any liabilities or expenses it incurs as a result of the lawsuit to the extent that the claims are being directed at the Company's products and services (the "Shake Shack Indemnification," and together with the "Shake Shack Services," the "Shake Shack Transactions"). The Company has admitted that payments made in connection with the Shake Shack Indemnification may exceed $120,000 over time. Defendant Garutti is the CEO of Shake Shack and serves as one of its directors. Shake Shack has done substantial business with Block, making Defendant Garutti a party to numerous related transactions. Because taking action against Block would potentially harm Shake Shack (and through Shake Shack, Defendant Garutti) financially, Defendant Garutti is unable to disinterestedly and independently consider commencing litigation against himself and the other Individual Defendants.

168.    In July 2019, the Company entered into a lease agreement with 900 N. Tucker Building, LLC ("900 N. Tucker") for a 15.5-year lease of office space in St. Louis, Missouri (the "St. Louis Lease"). Defendant McKelvey is affiliated with 900 N. Tucker, making him a party to this transaction. In July 2021, the Company began occupying the office space. During the fiscal

year ended December 31, 2021, the Company made approximately $1.3 million in payments in connection with the St. Louis Lease. Because taking action against Block would potentially harm the 900 N. Tucker deal (and through that deal, Defendant McKelvey) financially, Defendant McKelvey is unable to disinterestedly and independently consider commencing litigation against himself and the other Individual Defendants.

169.    Moreover, Defendants Botha and Summers served as members of the Audit and Risk Committee during the Relevant Period. In violation of the Audit and Risk Committee Charter, the Botha and Summers failed to adequately review and discuss the Company's Forms 10-K and Forms 10-Q; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, Botha and Summers further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

170.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to engage in the Cybersecurity Misconduct, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and the aiding and abetting thereof. In violation of the Code of Conduct, the Director Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations.

Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

171.    Block has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Block any part of the damages Block suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

172.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

173.    The acts complained of herein constitute violations of fiduciary duties owed by Block's officers and directors, and these acts are incapable of ratification.

174.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Block. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the

"insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Block, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Director Defendants is futile and, therefore, excused.

175.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Block to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

176.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Individual Defendants for Violations of**
### **Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

177.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

178.    The Individual Defendants participated in schemes to defraud with the purpose and effect of defrauding Block. Not only is Block now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful schemes perpetrated upon Block by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the

Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially-inflated prices, damaging Block.

179.     During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

180.     The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Block not misleading.

181.     The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Block.

182.     The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from

them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

183.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as senior executives or directors of the Company, as members of the Board, each of the Individual Defendants then serving as a director made and/or signed the Company's 2021 10-K filed with the SEC during the Relevant Period.

184.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

185.    Plaintiff on behalf of Block has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

186.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

187.    The Individual Defendants, by virtue of their positions with Block and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Block and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Block to engage in the illegal conduct and practices complained of herein.

188.    Plaintiff on behalf of Block has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

189.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

190.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Block's business and affairs.

191.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

192.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Block.

193.    In breach of their fiduciary duties owed to Block, the Individual Defendants willfully or recklessly caused the Company to engage in improper cybersecurity practices, and made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) the Company was engaged in the Cybersecurity Misconduct; (2) because of this, a former employee was able to download various Cash App Investing reports, giving this employee access to the Personal Information of more than 8.2 million Cash App Investing customers; (3) due to the foregoing, the Company was reasonably likely to suffer significant damage, including reputational harm; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

194.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

195.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

196.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed, while one of the Individual Defendants engaged in lucrative insider sales, netting proceeds of over $1,152,949.

197.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Block's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

198.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

199.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Block has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

200.     Plaintiff on behalf of Block has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Unjust Enrichment

201.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

202.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Block.

203.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Block that was tied to the performance or artificially inflated valuation of Block, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

204.     Plaintiff, as a shareholder and a representative of Block, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

205.     Plaintiff on behalf of Block has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Abuse of Control

206.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Block, for which they are legally responsible.

208.    As a direct and proximate result of the Individual Defendants' abuse of control, Block has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Block has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

209.    Plaintiff on behalf of Block has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Gross Mismanagement

210.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

211.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Block in a manner consistent with the operations of a publicly-held corporation.

212.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Block has sustained and will continue to sustain significant damages.

213.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

214.    Plaintiff on behalf of Block has no adequate remedy at law.

### SEVENTH CLAIM

**Against Individual Defendants for Waste of Corporate Assets**

215.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

216.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

217.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Block to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

218.    In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

219.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

220.    Plaintiff on behalf of Block has no adequate remedy at law.

### EIGHTH CLAIM

**Against Defendants Dorsey and Ahuja for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

221.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

222.     Block, Defendant Dorsey, and Defendant Ahuja are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Dorsey's and Ahuja's willful and/or reckless violations of their obligations as officers and/or directors of Block.

223.     Defendants Dorsey and Ahuja, because of their positions of control and authority as officers and/or directors of Block, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Block, including the wrongful acts complained of herein and in the Securities Class Action.

224.     Accordingly, Defendants Dorsey and Ahuja are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

225.     As such, Block is entitled to receive all appropriate contribution or indemnification from Defendants Dorsey and Ahuja.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)      Declaring that Plaintiff may maintain this action on behalf of Block, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Block;

(c)    Determining and awarding to Block the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Block and the Individual Defendants to take all necessary actions to reform and improve Block's corporate governance and internal procedures to comply with applicable laws and to protect Block and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Block to nominate at least six candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Block restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and

proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: December 20, 2022

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*
Timothy Brown
Saadia Hashmi
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
       shashmi@thebrownlawfirm.net

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

*Counsel for Plaintiff*

## **<u>VERIFICATION</u>**

I, James Tsou, am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe the allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on <u>12/15/2022</u>.

DocuSigned by:

*James Tsou*

59E5B056A171429...

James Tsou